Mr. Brice Black, good morning. Welcome. Please proceed. Good morning, Your Honor. Please report. I'm here arguing on behalf of Apotex in this matter, and I reserve five minutes for rebuttal with the clerk's office. You understand that when the yellow light comes on, you're beginning to consume the five minutes? I understand that, Your Honor. Very well. Please proceed. Your Honor, I'm going to focus on where we believe the trial court made the legal error, and that was after finding that, in fact, the 303 patent was prima facie obvious, the court, in reviewing the secondary considerations of non-obviousness and finding them four fives or errors, because, one, they compared the amlodipine bisalate solely to amlodipine maliate, as opposed to the other pharmaceutically acceptable salts made out of pharmaceutically acceptable ions that were compared in the 303 patent. So the trial court skipped the tosylate, skipped the other pharmaceutically anions, and only compared it to what had been described in the 909 patent as the preferred embodiment, and we believe that was an error of law, that the law required the court to review all of the pharmaceutically accepted anions that were tested to determine if the amlodipine bisalate was, in fact, or delivered an unexpected result. What law? It's easy for lawyers to say the law requires x, y, and z, but you have to be a little more specific. What case so holds? What regulation or statute requires that? Well, Your Honor, looking directly at the patent, because the patent actually describes what they were doing, what the 303 patent says is that the 909 patent disclosed several different pharmaceutically acceptable sort forms of amlodipine, and particularly the pharmaceutically acceptable acid addition salts are said to be those formed from acid. So when the judge said it was only amlodipine malate, even Pfizer said in the beginning of the 303 patent that that's not correct, that they were looking at all of the pharmaceutically acceptable salt forms of amlodipine. They then said it has now unexpectedly been found that the benzene sulfonate salt, hereafter referred to as the bisalate, has a number of advantages over the known salts of amlodipine. So again, Pfizer said that's what we're comparing it to. I think I'm not following your point. The patent says what it says. We've read it. We've read it again and again. And it does say exactly what you say, but so what? Well, because when you look at whether something has a superior result, you have to decide what are you testing it against? And what I believe the court's decisions have said is you're testing it against the prior art. Does it contain some unexpected result over the prior art? And in this case, after a lengthy bench trial, Judge Rosenbaum made oral findings on the record, and he found that the new salt, the claimed salt, did have greatly improved characteristics, particularly as to stickiness and stability, and that those improvements were unexpected. So it seems like if you can show that those two findings were clearly erroneous, you should win. But I don't see how you win by making an argument that he committed legal error. Because he only compared it to the malleate and not to the evidence, which was there were other pharmaceutically acceptable anions that were, in fact, as good as the miscellaneous. But so what? They weren't claimed in the patent being asserted. So who cares whether there was an equally good salt? The question is whether this salt had much better characteristics on stickiness and so forth, and unexpectedly so. And the answer is it didn't, and it wasn't unexpected. Well, then you're on the factual level. But I thought your initial argument was don't worry about the facts. This was a grossly illegal mode of analysis. Because we believe that the prior decisions of this court dealing with the question of secondary considerations of non-obviousness requires the court to look at not just one of the prior art, but Why are we even worrying about secondary considerations? Judge Rosenbaum held, found, in part, that there were great improvements with this salt and that they were unexpected. Now, if he was correct in those two findings, then secondary considerations need not even be assessed. Because he found that there was prima facie evidence of obviousness. He found that the prior art, which was the Bergey article, combined with the 909 patent, suggested the use of pharmaceutically acceptable anions. The Bergey article specifically lists the bisalate salt and the tosylate salt. And he found prima facie obviousness at that point, and that forced him to then look at the secondary considerations of non-obviousness. He certainly did use the phrase prima facie obvious. He used it at least twice. Once in reference to what the examiner had found, even though I would think that's utterly irrelevant and has no binding effect on the district judge at all. And he used it, I think, again in a rather colloquial fashion. But it seems to me he also plainly, we have the transcript right in front of us in the back of your blue brief, found that there were superior and unexpected results. That would make it patentable. That's the opposite of prima facie obvious. That's unobvious. But he's basing it on what was in the specification of the patent, which contained misstatements and false information. That's a different issue. If you win on inequitable conduct, then what we're discussing is irrelevant, because the entire patent's invalid. But as a matter of obviousness, I don't follow what you're trying to prove. Well, as a matter of obviousness, if the claim was stickiness and stability, it was not the only salt that did that. And to do that, we look at an original- It doesn't have to be the only salt. If this claim salt, there's only one salt claimed in this patent, if this claim salt does have unexpectedly superior results, by definition, it's not obvious. But it was not unexpected superior results. Well, then what's the evidence that it was expected or that it was not superior? We have a couple of things. One is we have the testimony of the inventor himself and his own written documents. For example, in writing his own documents, after having trouble with the Maliate, he found that both the Bisolate and the Tosolate were both stable. The Tosolate is not in this case. I don't understand why you keep trying to bring it up. It's not what's claimed. It's not what's disputed. It may be that it was just as good as the Bisolate, but that's not part of this case. Because to get the patent, Pfizer told the patent office that only the Bisolate could be made into a commercial salt. I don't agree with you. I've read what they said to the patent office. I don't see any basis of saying that they said that Bisolate and only Bisolate has adequate nonstickiness, et cetera. Oh, they say it right when they tell the patent office in the—when they supply the Wells Declaration, they say very specifically— I've read the Wells Declaration. They say, further, the attached Rule 132 declaration provides information that demonstrates that the Bisolate salt and amlodipine possess all the desired characteristics necessary for a medicinal agent. While Bisolate salts have been employed as pharmaceutically acceptable salts, it is not obvious that only the Bisolate salt and amlodipine would have all the necessary properties for a commercial product. That's what they told the patent office. What the inventor instead said was that the Tosolate was just as good and that the Tosolate has to go. I don't have any doubt that the Tosolate was just as good. But that doesn't make Bisolate obvious. When you have a genus and species case, as we have here, and the genus is covered in 909 and there's no dispute, when you're doing a species claim, which is what clearly the 303 is, it's claiming a species of the larger genus, you have to show that the specific species you're claiming against the others that would have been in the genus had these unexpected results. Not just against ameliate. And the Tosolate is part of that genus. The Tosolate was something that they would have had to show it was superior to that. And that's the point we're trying to make. And the judge erred when he did not look at the other salts within the genus. He only focused on the ameliate. Well, of course he only focused on the ameliate because that's what they were switching out of because of stickiness problems. And they were looking for a substitute salt that wouldn't have the stickiness problem. So of course he focused on that. That doesn't make it legal error. That just means judges can't discuss everything or cases will never end. But they have to look at what other salts were within the genus. And the Tosolate was clearly within the genus and we believe it was an error of law for him to ignore the Tosolate in this opinion. How about every other member of the genus? Is he required as a matter of law to analyze Bisalate against each and every other member of the genus? In this case, particularly those that Pfizer held out as the ones they tested and this was superior to. And the claims that they set out in the 303 patent are very broad. They don't just claim a specific formulation including the Bisalate. In some cases, there is evidence that the formulas with Bisalate were worse than, for example, others of the salts. Right, right. You argued that very fully in the brief. We have that. Do you want to reserve your rebuttal time? Thank you, Mr. Greco. Welcome. Good morning. Good morning, Your Honor. Please proceed. Your Honor, I'm Richard Greco. I'm representing Pfizer on this appeal. And I'd like to jump right into responding to Mr. Breisblatt's argument. The question of what's in the prior art, the scope and content of the prior art, is a factual question that Judge Rosenbaum addressed in a number of ways in his opinion. There was really no dispute as to what references were in the prior art. But Judge Rosenbaum found as a fact, and it's well supported by the evidence, that the art of picking pharmaceutical salts is empirical. It's trial and error. It's unpredictable. The fact that the art is unpredictable was essentially undisputed. Our expert, Dr. Anderson, testified to it expressly. Dr. Seema, who was Apotex's expert, agreed that salts are unpredictable. And we saw many examples in the trial. The Berg article itself tells you salts are unpredictable. You don't know what you're going to get. And we had an example just in this case of use of Bacillate with another 1,4-dihydropyridine. There's only two, the record shows only two compounds of the same group of amlodipine. Amlodipine and its backup compound were ever used with an anion from the sulfonate salt group to try to make a salt. With amlodipine, it was a great success. With the backup compound, it was a complete failure. It rapidly degraded. And in fact, another sulfonate salt, the mesylate, wouldn't even form as a solid. It was an oil. It just illustrates how unpredictable it was. And so with those findings of fact, that the art had a list of anions, not a list of amlodipine salts, a list of acids that had been used with other salts. And the fact that you cannot predict what happens when you take one of those acids and now use it with a new base, amlodipine, shows that this art was unpredictable and that the art consists of those things that had been tested that were made in the past, which was amlodipine maliate. And even if you look at the 909 patent, it suggested some other acids, all of which were shown to be much worse than even the maliate. Acetate was one of the examples that was catastrophically awful. The hydrochloride was completely unstable. That was inorganic. The citrate wouldn't even form as a solid when they did that. So as a finding of fact, Judge Rosenbaum looked at amlodipine mesylate, well supported with evidence. It had superior stability to every other salt tested, but particularly to the one that had been made in the prior art, the maliate salt. It solved the stickiness problem, both by testing that was done in the patent, but more importantly by actual experience, because the problem with the maliate didn't arise because somebody decided to do a test. It arose because the lab technicians were having problems with trying to make tablets out of maliate, serious problems. Now how do you address the argument made by counsel that somehow the tosylate is relevant to the obviousness question on the mesylate? Well, there's two things about that. First, amlodipine tosylate is not in the prior art itself. The tosylate anion was known. It had never been used on an FDA approved salt. And since it was unpredictable as to what properties you would get, or even if you would get a salt, as Dr. Anderson testified, a true salt, and that's a stoichiometric relationship, you can't say that that combination is in the prior art. You would at the very least have to say that it's a reasonable expectation that you could make that salt and that it would be usable as a pharmaceutical salt, particularly for claims two and three where you have a formulation claim and a pharmaceutical formulation claim in a tablet. And there's no evidence that anyone could have predicted what would have happened there. And in fact, essentially it was agreed by everybody that you couldn't predict what was happening. How do you explain the difference or the lack of difference between predictability and unexpectedly better results? Well, I think they're very closely related. Because in order, the presumption, the reason why you have the sort of obviousness presumption that certain compounds are closely related to others, you could expect them to have similar properties. Or if there's some particular teaching that you would expect them to have similar properties, then the new compound should be obvious because you know what they're going to do. But when you have an art where you have no idea what you're going to get when you make this new combination, you can't say that you have an expectation that it's going to be better. There was, as one of the scientists at the Pfizer team, Dr. Platt, indicated in his May 3, 1984 memo, he was against looking for another salt because he said, look, you're going to spend a lot of time and effort and you may never find one that will work. And that was clearly the possibility here.  Even if we had to consider that. The data shows that it's 98% as sticky as the malleate. Bacillate was 59% as sticky. So the tosylate had almost no improvement in stickiness. When Dr. Wells wrote his October 84 memo saying that it was almost as good, he didn't have the final report, which was JTX-10, that issued in February 1985, showing that it was almost the same. The tosylate was also hygroscopic, which bacillate wasn't. Bacillate had the advantage of not only solving the two problems, but it didn't have any tradeoff. And none of the other salts that were tested was that the case. They all had some other negative property. Hygroscopicity, or they were more sticky than malleate, or they were less stable than malleate. Bacillate was the only salt that in all four categories had high quality properties with no negatives. Now I understand that on a peel, there are really only two attributes that are central to the dispute. We've talked a lot about stickiness. Was the other one stability? Stability is the other, but there's a third one, which is the combination of good properties. Because if you had traded, if you had a salt that improved stability and stickiness, but was completely insoluble, for example, that wouldn't have solved your problem, or if it were very hygroscopic. But how about bacillate and tosylate on those three comparisons? Bacillate was more stable than tosylate, though it's a qualitative judgment.  Tosylate, I believe, was close to bacillate, maybe second or third. On stickiness, tosylate was essentially not an improvement. It was 98% of the stickiness of the problem solved, which was malleate. Bacillate was about half that, 59% as sticky. So when you consider all three of those, I guess you would argue that the suggestion made to the examiner that bacillate was uniquely better than the other test was actually quite accurate. It is quite accurate. When you take all three into account. If you do them one attribute at a time, maybe not. Well, in fact, all four, because there's solubility, which was good. Tosylate's solubility was just under the cutoff of one milligram per milliliter. It was 0.9, probably good enough. But it was still not, it was just on the borderline. But on the key thing of stickiness, it didn't really give much of an improvement. And not close to as good as bacillate. Not close to bacillate, and it was hygroscopic, which was a new problem that we didn't have before. So I think the judge's finding of the scope and content of the prior art and the difference is a fact matter that is well supported by the record. Let me ask you this. If there was a universe of 53 FDA-approved salts, how did Wells and Davidson know to start with the six candidates that they started with? Well, one was maliate, so of course you had to do that. So they needed five others to see if they were better. How did they pick the five other candidates out of the universe of 53 salts? What Dr. Wells testified is he picked a range of materials because he didn't know which, if any, would work. He tried to have a gradient from strong acids down to weak acids because he had a hunch, it turned out to be wrong, that the weaker acids would be more stable. Acetate was the weakest acid. It was one of the worst of them all. The free base he also used, which is let's not use any salt. Let's just use amlodipine. That was unstable and it was more sticky, so that didn't work. So he picked a range of different families of chemicals. He picked a range of strengths of acid and it was trial and error. Maybe one of those would work. Maybe they wouldn't. Maybe none of them would work. There's no scientific principle at the outset that says that maliate was not going to be the best you could do. What about some of the prior art that had used Bessalate as the salt, the carrier? I guess your argument there is, well, yeah, but the active ingredient there was totally different, so it might work or it might not work with this active ingredient. We have specific testimony. There were actually only two Bessalate salts in the art, apricurium and mesoripizine. They're very different structures than amlodipine. Dr. Anderson's very express testimony was the fact that you made a salt with a different compound like that tells you nothing about what you're going to get when you make it with amlodipine. As I mentioned earlier with the other compound, 52A31, you can see that as a perfect example. One compound from the very same family of chemicals, it works great. Another compound from the same family, it's completely unusable. So it's a complete trial and error process, a research process that does not guarantee that you will find an answer or that you would find one particularly good where you could have good results. If I understand it, then it not only requires trial and error or experimentation, testing, whatever we want to call it, but it's all done in the blind. You never know whether the next one is going to work or not work. I think that's exactly right, and you can see that here. Wells' memo in April of 1984 starts out by saying that he thought the best candidate was going to be acetate. As he testified, it was catastrophically awful. So I guess the strongest theoretical part of your argument is rather than having a reasonable expectation of success, the tester would have had no expectation of success because it could just as easily be failure as success. That's exactly right. That is exactly the point. Let me just mention one other point that wasn't directly raised but on the inequitable conduct argument. This again was findings of fact by the judge. He found, having heard the witnesses live and in person, that there was no evidence of intent to deceive and that there was in fact no false statements, let alone material false statements. Those are both two findings of fact well supported by the record. I think for an appeal argument, that really ends the question. What about the statement that was made? This appears to the appendix, page 1813, with the repeated runs of 100, 150, 200, 250, and 300 tablets, which, as I understand it, was not accurate. The patent description of the number, the place where they took the data points, is probably not correct based on the report. What they were calculating was a rate, a slope, how much accumulates per number of tablets. And they tested that at 10, 20, 30, 50. They also did many longer runs. I understand that, but don't you think the examiner would have liked to know that this information was not accurate? I don't think it makes the slightest difference in terms of how the data appears because it's describing what is a slope. So it's like saying a car that went one mile every 60 seconds for five minutes in a row or 60 miles every hour for five hours in a row. It's going the same speed. The fact that the numbers were higher doesn't make the data look any better or any worse for either salt. It doesn't make Bessalate look better. It doesn't make it look worse. And I suppose that also goes to the point that you argued that there's no showing of intent. There was a finding of no intent. And it's not the kind of thing anybody would deliberately misrepresent. I mean, it clearly makes no difference. It clearly does not make the data look any better. It's just simply a confusion because there were many, even in the final report, there were tests where they went up many hundreds of tablets over runs of five, ten minutes at a time. So something got confused, but it's not of any importance to the result. The results were reported exactly as they appear in the report to the management. It's not the kind of thing anybody would have any reason to deceive, and the court found there was no intent. Mr. Greco, as I recall the law, three steps in finding inequitable conduct. You have to find intent to deceive. You have to find materiality. And then as the third step, you have to do a sort of an equitable exercise and find, in effect, that the misconduct by the prosecutor to the patent office was egregious enough to warrant making the entire patent and all its claims unenforceable. And it's very clear from page 25 of the transcript that Judge Rosenbaum found no intent to deceive and no materiality. But I take it that it's also clear, although maybe less expressed, less explicit, that even if he had found minimal materiality and minimal intent, he would have nevertheless on that third discretionary equitable type analysis not have rendered the patent unenforceable. Well, he doesn't address that in so many words, but I think the nature of when he looked at the alleged materiality and found that these statements were either not false or of trivial importance, I think that would suggest that the materiality would have been very low at best and that he would have had he come to that question. Right. Now, suppose we have found that he clearly erred on materiality and he clearly erred on intent. What then could we say, well, therefore, inequitable conduct was proven or would we necessarily have to remand it back to him to do the equitable analysis or what? I think you probably have to remand to do the equitable analysis as was done, for example, in the Purdue case when the level of materiality was changed. It was sent back for the judge to reconsider that with the lower level of materiality that the Federal Circuit found. All right. Thank you, sir. Thank you. Mr. Briceblatt, you have just under four minutes. Yes, Your Honor. Mr. Greco misspoke at least on one important and critical area and that was what the inventor knew at the time he applied for his patent. Mr. Greco went back and said, well, after the October 1984 memo, there was a further memo on stickiness in February that had more data in it. In fact, the stickiness memo in February of 1985 showed, in fact, there was only 150 tablets tested. They made up the test and the patent out of whole cloth. That test was never conducted. The slope, however, shows to two decimal points, which you wouldn't get after 150 tablets, and that's what Dr. Seema testified to at trial, that there was error that they never expressed to the Patent Office. The other thing they didn't express to the Patent Office is what the very inventor, Dr. Wells, said to his patent lawyer in November 28, 1985. Improved shelf life of solid dosage forms due to improved solid-state stability of the besolate and the tosylate salts. He's putting the besolate and tosylate salts together and saying that they have improved solid-state stability. He goes on to say, improved processing of tablets and capsules because sticking is considerably reduced by the besolate and tosylate salts. This is the inventor. This is after the stickiness memo. This is before they go to the U.S. Patent Office. He's writing to his own patent lawyer, and he is saying very specifically that the improved processing of tablets and capsules because stickiness is considerably reduced by the besolate and tosylate salts. And he knew then what the slope was between the besolate and the tosylate because it's in the same memo at 8094. The same stickiness chart that appears in the patent appears in the inventor's memo. The inventor knew that the tosylate was as good as the besolate, regardless of that alleged .98 difference. And he says it, and the trial court ignored the words of the inventor written at a time when he had no... Wait a minute. Wait a minute. Did the trial court ignore the evidence? He's finding that two things. One is that the besolate was so much better than everything because of stickiness. Clearly it wasn't better than the tosylate. No, no, no. But the question is whether the trial court refused to weigh your evidence. I don't see how you can say that. The trial court makes no mention of... Oh, that's a different matter. Trial judges often don't make mention of every single piece of evidence. Opinions would have to be hundreds of pages long. But if the argument is going to be that there are superior results over the other salts in the species by besolate, then when you have the inventor himself saying that, as this court has said, on the critical categories of stickiness and stability, the besolate and the tosylate are the same, then the trial judge has clearly made error because he has ignored admissions by the inventor. It's just like when he says that he finally agrees with us on every point... Was the inventor a 36B witness? Or just an ordinary fact witness? The inventor was there as the inventor. So he's a fact witness. You said admissions. That's a word of art, I think. There's not an admission being made by a party here. There's a memo by a person who was a witness that contained certain statements, and you read them. And then there was other evidence, and the judge weighed all the evidence and made his finding. But the problem is the judge ignored the admissions by the inventor that went to the heart of the patent. He ignored the statements in the patent that said tests were conducted that weren't conducted. They never tested on stability, the actual capsules and tablets, as claimed in the patent. They never ran the test of 1,050 tablets for processing as they claimed in the patent. On hydroscopicity, the inventor himself says it is the hydroscopic nature of the drug or its salt which contribute to free moisture, and then he finds that both the tosylate and the besolate should be considered non-hydroscopic. So on every point, the inventor himself, before he gets into the U.S. Patent Office and they make things up, basically they're saying that the besolate isn't superior to all the other salts within the species. All right, thank you, sir. Thank both the counsel. We'll take the case under advisement.